UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEPHEN W. HIGGINS and
RHONDA S. HIGGINS,

    Plaintiffs,

vs.                                                   Case No. 8:06-CV-1928-T-27MSS

DAVID GEE, in his official capacity
as Sheriff of Hillsborough County, Florida,
and REGINALD DAVIS, individually,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** is Defendant David Gee's Amended Dispositive Motion for Summary Judgment (Dkt. 34), to which Plaintiffs and Defendant Reginald Davis have responded in opposition (Dkts. 71, 72). Upon consideration, Defendant Gee's motion is GRANTED IN PART and DENIED IN PART.

### *Background*

In this action, brought pursuant to 42 U.S.C. § 1983 and state law, Plaintiff Stephen Higgins ("Plaintiff") alleges that he was subject to an unlawful search and unlawful arrest for grand theft, stemming from a subordinate's false accusations that he stole tools and other items from his employer. Rhonda Higgins is Plaintiff's wife (Am. Compl. ¶ 7), and she brings a state law claim for loss of consortium. Plaintiffs sue Defendant David Gee, in his official capacity of Sheriff of Hillsborough County, Florida, and Defendant Reginald Davis, in his individual capacity. By contemporaneous Order, this Court denies Defendant Davis's separate Motion to Dismiss (Dkt. 70).

1

During the events at issue, Plaintiff was employed by The Industrial Company, Inc. and Western Summit Constructors, Inc. (collectively, "TIC") as a foreman at TIC's work site at the Port of Tampa. (Am. Compl. ¶ 8; Pl. Aff. ¶¶ 3-4). Lisa Baer was TIC's human resource supervisor and Charlie Thompson was the senior construction manager. (Am. Compl. ¶ 10; Dkt. 34, Exh. E at 572). On August 26, 2002, Gene Welsher, one of Plaintiff's subordinates as well as a long-time friend and former roommate, reported to Baer that Plaintiff had stolen thousands of dollars of tools from TIC and "Fluor Daniels"[1] and that he helped Plaintiff build a shed on Plaintiff's property in Ocala to hide the tools. (Dkt. 34, Exh. A at 459). Specifically, he reported that Plaintiff stole: "welding leads, stringers (in the box's), brand new chain falls, come-alongs, shackles, hundreds of grinding discs, grinders, band saws, etc" and that "[h]e has 4 TIC CB radios at home." *Id.* Welsher stated that Plaintiff threatened his life on numerous occasions, most recently on August 23, 2002, when Plaintiff allegedly threatened him with a gun and accused him of going to buy crack cocaine with his paycheck. *Id.* Welsher also stated that Plaintiff physically assaulted him the following day and that he was pressing charges. *Id.* Welsher noted that another TIC employee, Randy Huggins, "saw the radios and is willing to testify." *Id.* Huggins provided a separate statement, which provided, in part: "I James R Huggins would like to let someone know that I am tired of being called a crackhead by Steve Higgins. . . . I seen some raido's (*sic*) that belong to TIC." (Dkt. 34, Exh. A at 461). Huggins also stated that Welsher told him that Plaintiff stole them from another job. *Id.* After receiving these reports, Baer reported the alleged theft to the Hillsborough County Sheriff's Office ("HCSO"). (Am. Compl. ¶¶ 16-17; Dkt. 34, Exh. A at 453).

---

[1] It is not clear from the record who Fluor Daniels is, and he does not play a part in the investigation as it is related by the parties.

2

HCSO Deputy Xavier Palacios responded to the complaint. (Palacios Dep. at 8-9). Palacios went to the work site and interviewed Baer as well as another man whose identity he could not recall. (Palacios Dep. at 9). He also interviewed Welsher by telephone, who iterated that Plaintiff had stolen over $10,000 worth of tools and that he helped Plaintiff build a shed in Ocala and move the tools there. (Palacios Dep. at 49-50, 54; Dkt. 34, Exh. A at 458). Welsher also specifically reported that Plaintiff placed a "Metabo" grinder, worth $350.00, in his lunch box on August 22, 2002 and then left the job site. (Palacios Dep. at 12-14; Dkt. 34, Exh. A at 454). Palacios filled out an Incident Report and took copies of the written statements from Welsher and Huggins before his shift ended at 6:00p.m. (Palacios Dep. at 18-19).

Sometime between 5:00p.m. and 6:00p.m. after he finished the interview, Palacios called the on-call detective, Defendant Reginald Davis. (Palacios Dep. at 29-30). Palacios testified that Davis told him that any probable cause for an arrest was in Ocala, that he was too busy to come out, and to interview Higgins and see if he confessed. (Palacios Dep. at 29, 31-32, 38). Palacios reported this conversation to his supervisor, Corporal Carl Hassell, and offered to arrest Higgins himself, based on what he believed was probable cause. (Palacios Dep. at 19, 24-25).

Hassell spoke with Sergeant John Clamon, Davis's supervisor. (Hassell Dep. at 17; Dkt. 34, Exh. D). They agreed that further investigation was necessary, and Deputy Jason Goff was assigned to relieve Palacios. *Id.* Goff met with Palacios, and then interviewed Baer and Thompson and obtained their sworn, written statements. (Goff Dep. 12-13; Dkt. 34, Exh. E at 558, 571-72). Goff also interviewed Welsher and Huggins at their hotel and obtained their sworn, written statements. (Goff Dep. at 28-29; Dkt. 34, Exh. E at 577-79). Welsher's second written statement was consistent with his previous written and oral statements, but was more detailed. (Dkt. 34, Exh. E at 577-78).

3

It included additional items that Plaintiff allegedly stole from TIC, including extension cords, welding gloves, a lighter, drug tests, rain gear, and watches. *Id.* He stated that Plaintiff bragged that he was going to use the tools to start his own business and that Plaintiff had previously removed items from other job sites. *Id.* Welsher alleged that he and Plaintiff started building the shed in Ocala during Thanksgiving, that Plaintiff previously made trips to Ocala every weekend, and that he did not make any trips in the last three months because he ran out of room in his shed. *Id.* Welsher stated that he had not reported the thefts earlier because Plaintiff threatened to kill him and told him he would never be able to work in the business again. *Id.* By contrast, Huggins' second written statement was brief, stating: "When I moved in with [Welsher] I went to put my close (*sic*) in the closit (*sic*) and I see 4 TIC radio's that belong's to TIC and I asked [Welsher] where they came from and he said Steve Higgins took them from the job."[2] (Dkt. 34, Exh. E at 579).

After interviewing Welsher and Huggins, Goff called Deputy Adam Arnold for assistance and went to Plaintiffs' trailer. (Goff Dep. at 33, 44). Before arriving, Goff also called Davis and asked if he wanted to respond, given that the investigation was developing in complexity and potentially involved areas outside of his assigned area of the Port of Tampa. (Goff Dep. at 34-38). Goff testified that Davis declined to participate because he believed Welsher was not credible, given that Plaintiff had allegedly beat him up. (Goff Dep. at 76). On the other hand, Goff believed Welsher was credible because he interviewed Welsher in person, he supplied a detailed list of stolen items, he gave a detailed background of his relationship with Plaintiff, he did not hide his past drug activity, and his rift with Plaintiff explained his reasons for reporting the thefts. (Goff Dep. at 76-79).

---

[2] Plaintiff objects to Huggins' statements as hearsay.

4

When the deputies arrived at Plaintiff's trailer, Goff and Arnold knocked on the door, asked for identification, which Plaintiff provided, and told Plaintiff that there was allegation of theft by his employer. (Goff Dep. at 45-46). Goff then asked if Plaintiff would allow them to search the residence, which he refused. (Goff Dep. at 46-48). Plaintiff avers that the deputies requested his consent to search the trailer for approximately thirty minutes, and during this time, he refused and tried to explain his history with Welsher. (Pl. Aff. ¶¶ 6-7). Specifically, Higgins told the deputies that Welsher tried to get two of his former supervisors in trouble on other occasions after they had a falling out. (Pl. Aff. ¶ 7d.). He also told them that Welsher's hotel was a known drug haven, that Plaintiff had kicked Welsher out of his motor home after Welsher defaulted on payments and Plaintiff found drug paraphernalia, and that Plaintiff hit Welsher only in self defense. (Pl. Aff. ¶ 7b., f.). Plaintiff maintains that the deputies "did not want to hear anything I said, they just kept asking to search my trailer." (Pl. Aff. ¶ 7g.)

At some point, the deputies noticed Plaintiff's wife, asked for her identification, and discovered she had an outstanding felony warrant. (Pl. Aff. ¶¶ 9-10; Goff Dep. at 50-51). Rhonda Higgins explained that this was a mistake, that there was a "quash order," and showed it to the deputies. (Pl. Aff. ¶¶ 12-13). Goff arrested her after the Miami-Dade Police Department, which was holding the active felony warrant, advised that they would extradite her. (Goff Dep. at 52). Plaintiff avers that he was also handcuffed, which the deputies told him was "for their safety." (Pl. Aff. ¶ 15). Plaintiff maintains that they kept requesting to search the trailer, and "they advised me that there was a deputy who was coming to the scene and I would then let them search" and that "I was told that I would change my mind when Davis arrived." (Pl. Aff. ¶¶ 16, 19).

According to Davis, Sergeant Clamon ordered him to go to the scene and "put that man under

5

arrest." (Dkt. 34, Exh. J at 746; Goff Dep. at 59). Goff maintains that Plaintiff was not handcuffed when Davis arrived. (Goff Dep. at 59). Goff testified that Davis told Plaintiff he was under arrest and that Deputy Arnold then handcuffed Plaintiff. (Goff Dep. at 60).[3] Goff testified that Davis told Plaintiff that he would have to get a search warrant and that "stuff gets broken during the search warrants, possibly the door. And he told him some shit was going to get fucked up." (Goff Dep. at 61). Goff further testified that "Mr. Higgins said he didn't want that to happen to his trailer, so he said, you can go ahead and search it." (Goff Dep. at 61). Arnold reported that Davis told Plaintiff that after getting a search warrant he would "[b]reak in the suspect's door and tear his residence apart and the suspect would still be under arrest." (Dkt. 34, Exh. H). Goff read a consent to search form to Plaintiff, who signed it. (Goff Dep. at 62).

Goff and Davis searched the trailer, with Plaintiff present. (Goff Dep. at 66-67). They found two pairs of safety goggles in a cabinet in the dining room, one handheld radio in a compartment under the mattress with the letters "TIC," a radio charger on the night stand with the letters "TIC," four drug test kits in the dresser, two small handheld radios in the kitchen cabinet, and a laptop computer and case. (Goff Dep. at 67-69; Dkt. 34, Exh. E at 560-61). Goff spoke with Charlie Thompson at TIC, who stated that all of the items belonged to TIC. (Goff Dep. at 97; Dkt. 34, Exh. E at 561). Although the deputies did not find the Metabo grinder, they found a lunch cooler consistent with the description given by Welsher. (Dkt. 34, Exh. E at 559). Goff testified that they did not break the door, break a lock, or destroy any property. (Goff Dep. at 95-96).

Plaintiff was ultimately found "not guilty" on charges of petty theft and grand theft on May

---

[3] The Court notes that Goff's Incident Report places the arrest as taking place after the search. (Dkt. 34, Exh. E at 561).

6

22, 2003. (Am. Compl. ¶ 50). On December 12, 2003, Davis was suspended for two days. (Dkt. 34, Exh. M). The Notice of Employment Suspension stated, in part, that Davis used his "official position as a law enforcement detective to threaten and coerce the suspect into consenting to a search of his residence." *Id.*

HCSO Standard Operating Procedure ("SOP") 565.00(IV)(B) sets out principles for warrantless searches with consent. (Dkt. 34, Exh. K at 1-2). The SOP requires, in part: "[i]f the suspect is in custody, he/she must be advised of the following: 'You have the right to refuse to grant permission for me to search unless I have a search warrant.'" (Dkt. 34, Exh. K, 565.00(IV)(B)(3)(a)(2)). Plaintiff contends that he did not receive this warning and that the warrantless search of his trailer was not consensual in light of the threats allegedly made by Davis. Plaintiff also alleges there is no HSCO procedure governing warrantless arrests and that HSCO relies solely on Fla. Stat. § 901.15, which sets forth the grounds for warrantless arrests.

Plaintiffs' Amended Complaint alleges the following claims: unlawful search and false imprisonment pursuant to Florida law against Defendant Gee in his official capacity (Count I), or, in the alternative, Defendant Davis (Count II); unlawful search and false arrest pursuant to 42 U.S.C. § 1983 and the Fourth Amendment against Defendant Davis (Count III); inadequate training pursuant to 42 U.S.C. § 1983 against Defendant Gee in his official capacity (Count IV); and loss of consortium by Rhonda Higgins against Defendant Davis, or, in the alternative, Defendant Gee (Count V). In the instant motion, Defendant Gee contends that summary judgment should be granted on Count IV because HCSO has no unlawful custom or policy regarding consensual, warrantless searches and warrantless arrests. As to Count I, Defendant contends that the state law false imprisonment claim fails because there was probable cause to arrest Plaintiff, which is an affirmative

defense to this tort, and that HCSO retains sovereign immunity for the state law unlawful search claim because Davis was acting outside the scope of his employment in effecting the search. Finally, Defendant alleges that Count V, a derivative count, fails because there is no viable state law cause of action. As set forth below, Defendant's motion is granted as to the Section 1983 claim (Count IV) and is denied as to the state law claims for unlawful search, false imprisonment, and loss of consortium (Counts I and V).

### *Standards*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## Discussion

### A.  42 U.S.C. § 1983 (Count IV)

Plaintiff's Section 1983 claim against Defendant Gee in his official capacity is properly evaluated as a claim against the HCSO. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). It is axiomatic that the HCSO may not be held liable in a Section 1983 action solely on a theory of vicarious liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). In order to defeat the motion for summary judgment, Plaintiff must produce evidence that he was adversely affected by the HSCO's unlawful policy or custom. *Id.* at 694; *Powell v. Barrett*, 496 F.3d 1288, 1318 (11th Cir. 2007). In proving the establishment of an official policy, "only municipal officers or groups who have final policymaking authority may subject the municipality to § 1983 liability." *Campbell v. Rainbow City*, 434 F.3d 1306, 1312 (11th Cir. 2006); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 483-84 (1986). For liability to attach to a municipal custom, Plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotations omitted); *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003). Because a municipality will rarely have an express policy permitting unconstitutional conduct, the Supreme Court has held that an alleged failure to train must evidence

"deliberate indifference" to the rights of the municipality's inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Powell*, 496 F.3d at 1318. Accordingly, Plaintiff must demonstrate that policymakers made "a 'deliberate' or 'conscious' choice from among various alternatives." *Id.*

Plaintiff has produced no evidence of an unconstitutional municipal policy or custom. The HSCO has an SOP on "Warrantless Searches," which Plaintiff does not challenge as inadequate or unlawful. Moreover, the Internal Affairs investigation and Davis's resulting two-day suspension for improperly coercing Plaintiff's consent to search his residence "suggests that his actions were inconsistent with [HSCO] goals and training" regarding warrantless searches. *Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007). Although Plaintiff alleges that Davis made the arrest and search at the direction of Sergeant Clamon, Plaintiff fails to demonstrate that Clamon had any final policy-making authority. Simply put, "[n]o evidence exists here that indicates [Gee] or the [HSCO] approved of [Davis's] decision to arrest based on the limited information he possessed." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996); *Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996) ("A city may be held responsible where the authorized policymakers 'approve a subordinate's decision and basis for it.'"); *Cannon v. Macon County,* 1 F.3d 1558, 1565 ("it is difficult to see how the Sheriff would have final authority over who each deputy arrest and whether a deputy has probable cause to arrest and/or hold arrestee").[4]

Finally, Plaintiff has alleged absolutely no facts of record indicating that the HSCO exhibited a "deliberate indifference" in not instituting a separate internal procedure governing warrantless

---

[4] Although Plaintiff alleges in the Amended Complaint that HSCO had a policy of training deputies to use "bad cop" statements to obtain coerced consent (Am. Compl., ¶ 95), Plaintiff has pointed to no record evidence supporting this allegation. Plaintiff also alleges that HSCO had a policy of disregarding the "Warrantless Search" SOP and of blindly obeying directions of supervising officers. (Am. Compl., ¶¶ 93, 105). Again, however, Plaintiff has provided no evidence supporting these allegations.

arrests. Plaintiff has provided no authority for the proposition that a law enforcement agency is required to implement a specific internal policy on every law enforcement procedure, especially when there is a sufficiently detailed statute in place. *See* Fla. Stat. § 901.15. Plaintiff provides no other evidence concerning HCSO's training, or lack thereof, on warrantless arrests and searches. Essentially, Plaintiff attempts to impose vicarious liability on the HCSO for Davis's alleged actions, precisely what Section 1983 does not permit.

Based on the foregoing, Defendant Gee's motion for summary judgment is granted on Count IV.

### B. *Unlawful Search and False Imprisonment (Count I)*

In Counts I and II, Plaintiff alleges that Defendant Gee in his official capacity, or, in the alternative, Defendant Davis, are liable for the Florida law claims of "unlawful search" and false imprisonment. Defendant Gee argues that the HCSO is not liable because: (1) in effecting the allegedly unlawful search, Davis was acting outside the scope of his authority or in bad faith, instances in which HCSO's sovereign immunity for torts is not waived, Fla. Stat. § 768.28(9)(a); (2) there was no false imprisonment because the deputies had probable cause to arrest Plaintiff, which an affirmative defense to this claim.[5] Davis disputes the allegation that he was acting outside the scope of his employment or with any improper purpose.

---

[5] Defendant also argues that Plaintiff is collaterally estopped from litigating the issue of probable cause because he never questioned probable cause in the state criminal trial. Under Florida law, collateral estoppel applies if (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies, and (4) a final decision has been rendered by a court of competent jurisdiction. *Quinn v. Monroe County*, 330 F.3d 1320, 1328-29 (11th Cir. 2003). As Defendant points out, however, the issue of probable cause was never raised during the state court criminal proceedings. Because it was never raised, the issue of probable cause was not fully litigated, nor was it the subject of a final decision on the merits. Defendant confuses collateral estoppel, which deals with issues *actually* raised and decided, with the defense of res judicata, which prevents parties from relitigating issues that were or *could have been raised* in an earlier action. *See generally Allen v. McCurry*, 449 U.S. 90, 94 (1980). There is no allegation here that the latter theory applies.

*1.     Unlawful Search*

As an initial matter, the Court notes that Plaintiff has provided no authority supporting recovery pursuant to a tort claim for "unlawful search," which, pled in this fashion, appears to be premised on a Fourth Amendment theory, properly redressed through Section 1983. *See* Fla. Stat. § 768.28(1) (emphasis added) (waiving sovereign immunity "for liability for *torts . . . . if a private person would be liable to claimant*"); *Garcia v. Reyes*, 697 So. 2d 549, 550 (Fla. 4th DCA 1997) (noting that Fla. Stat. § 768.28 "was intended to render the state and its agencies liable for damages for traditional torts under state law, but to *exclude such liability for constitutional torts*") (internal quotations omitted and emphasis in original); *but see Hennagan v. Dep't of Highway Safety and Motor Vehicles*, 467 So. 2d 748, 749 (Fla. 1st DCA 1985) (listing "unlawful search" among the dismissed tort claims). Defendant has not questioned the viability of this theory against the HSCO, however, and to the extent that this comprises a viable tort claim, the Court finds that Defendant's motion is due to be denied.

Pursuant to Fla. Stat. § 768.28, an agency such as the HCSO retains its sovereign immunity when: (1) the officer acts outside the scope of his employment, that is, "if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess, or if there is not even a pretense of lawful right in the performance of the acts" (internal citation omitted), *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996); or (2) the officer acts in "bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property." *Id.* at 734-35, Wells, J., (specially concurring); *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004).

Defendant appears to premise its argument on the fact that Davis was ultimately suspended

12

for the incident with Plaintiff. (Dkt. 34 at 15-16). This fact, standing alone, does not suffice to demonstrate the Davis was acting outside the scope of his authority or acting in bad faith. Conduct that it is an abuse of power, rather than an usurpation of power, is still within the scope of employment"if it occurs substantially within authorized time and space limits, and it is activated at least in part by a purpose to serve the master." *McGhee*, 679 So. 2d at 731-33 (quoting *Hennagan*, 467 So.2d at 751). There is adequate evidence indicating that Davis was acting with the purpose to serve the HCSO. Davis, as the on-call detective, was allegedly ordered to the scene by Sergeant Clamon to effect an arrest and search, part of his duties as a deputy.[6] (Dkt. 34, Exh. J at 746). In effecting the arrest and search, Defendant has pointed to no evidence establishing that Davis acted out of any personal motivation, other than a desire to serve his employer. *Cf. Craft v. John Sirounis and Sons, Inc.*, 575 So. 2d 795, 796 (Fla. 4th DCA 1991) (finding that conduct was outside the scope of employment where off-duty officers participated in barroom brawl). At the most, there is a disputed issue of fact as to whether Davis was acting in bad faith, with malicious purpose, or with wilful and wanton disregard of human rights, safety, or property. *See. e.g.*, *McGhee*, 679 So. 2d at 733. Accordingly, Defendant's motion for summary judgment is denied as to Plaintiff's state law claim for unlawful search.

2.  *False Arrest*

Under Florida law, it is well-established that law enforcement may be liable for the torts of false arrest and false imprisonment.[7] *Andrews v. Fla. Parole Comm'n*, 768 So. 2d 1257, 1269 (Fla.

---

[6] Indeed, the Notice of Employment Suspension issue states, in part, "While representing the Sheriff's Office you used your official position as a law enforcement detective to threaten and coerce the suspect into consenting to a search of his residence." (Dkt. 34, Exh. M).

[7] "False arrest and false imprisonment are different labels for the same cause of action." *Weissman v. K Mart Corp.*, 396 So. 2d 1164, 1165 n. 1 (Fla. 3d DCA 1981).

1st DCA 2000). Defendant asserts that there was probable cause to arrest Plaintiff, which operates to bar a state law claim for false arrest. *Fernander v. Bonis*, 947 So. 2d 584, 589 (Fla. 4th DCA 2007). This is an affirmative defense, for which the Defendant has the burden of proof. *City Of St. Petersburg v. Austrino*, 898 So. 2d 955, 957 (Fla. 2d DCA 2005).

An officer possesses probable cause to make an arrest if "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990); *Skop*, 485 F.3d at 1137 (11th Cir. 2007). This standard "is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." *Skop*, 485 F.3d at 1137-38. Accordingly, "[w]hether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern. *Id.* (internal citation omitted). The elements of grand theft are: (1) knowingly (2) obtaining or using, or endeavoring to obtain or use, property of another (3) with intent to deprive the person of a right to the property or a benefit therefrom, or to appropriate the property to one's own use or to the use of any person not entitled thereto. *Pizzo v. State*, 945 So. 2d 1203, 1207 (Fla. 2006); Fla. Stat. § 812.014(1). In addition, "[i]t is grand theft of the third degree and a felony of the third degree . . . if the property stolen is: Valued at $300 or more, but less than $5,000." Fla. Stat. § 812.014(2)(c).

As an initial matter, Plaintiff correctly notes that there is an issue of fact as to when the arrest occurred. An arrest requires the presence of the following four elements:

> (1) a purpose or intention to effect an arrest under a real or pretended authority; (2) an actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested; (3) a communication by the

arresting officer to the person whose arrest is sought, of an intention or purpose then and there to effect an arrest; and (4) an understanding by the person whose arrest is sought that it is the intention of the arresting officer then and there to arrest and detain him. *Bravo v. State*, 963 So. 2d 370 (Fla. 2d DCA 2007).

Plaintiff avers that the deputies placed handcuffs on him before Davis arrived, "for their safety," which Goff disputed. *See also Melendez v. Sheriff of Palm Beach County*, 743 So. 2d 1145, 1148 (Fla. 4th DCA 1999) (noting that the use of handcuffs does not, by itself, indicate an arrest has been made). Goff testified that Davis placed Plaintiff under arrest when he arrived, although the account in Goff's Incident Report places Plaintiff's arrest after the search. For the purposes of this discussion, the Court assumes that the arrest took place at some point before the search, either when Plaintiff was initially handcuffed or when Davis arrived.[8] Defendant's affirmative defense is therefore evaluated based on the facts and knowledge of the deputies at that time.

The parties do not dispute the sources supporting the officers' probable cause determination. Instead, Plaintiff contends that the officers lacked probable cause because: (1) Welsher was not credible because of his history with Plaintiff; (2) Huggins' corroborating statement was not credible because it was entirely based on things Welsher told him; and (3) according to Goff's testimony, Davis previously stated that there was not probable cause to arrest Plaintiff based on Welsher's tip.

In determining whether an informant's tip demonstrates probable cause, courts consider the informant's veracity, reliability, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 271 (1983) (setting forth standard for an informant's tip sufficient to obtain search warrant); *Ortega v. Christian*,

---

[8] Even if the arrest occurred after the search, it is axiomatic that the fruits of an illegal search cannot furnish probable cause for an arrest. *United States v. Palazzo*, 488 F.2d 942, 947 (5th Cir. 1974); *Sims v. State*, 743 So. 2d 97, 98 (Fla. 1st DCA 1999). In the contemporaneous Order on Defendant Davis's Motion to Dismiss, the Court has found that the Amended Complaint adequately alleges that the search was non-consensual, and therefore unconstitutional.

15

85 F.3d 1521, 1525 (11th Cir. 1996) (applying this standard to warrantless arrest). These are not rigid requirements, and "[a] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *State v. Thomas*, 960 So. 2d 869, 872 (Fla. 2d DCA 2007). Furthermore, "the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis." *Id.* Thus, the usual case upholding a probable cause determination involves a tip from a known reliable informant providing sufficient detail, which the officers then confirm by personal observation, or in certain cases, through their own pre-existing knowledge. *See e.g., Draper v. United States*, 358 U.S. 307, 312-13 (1959); *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002); *United States v. Chaves*, 169 F.3d 687, 691 (11th Cir. 1999); *Thomas*, 960 So. 2d at 872; *State v. Butler*, 655 So. 2d 1123, 1131 (Fla. 1995). The courts have, however, held that officers lack probable cause in certain situations where the officer failed to corroborate a tip or report. *See e.g., Ortega*, 85 F.3d at 1525; *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004).

Welsher's statement indicates a good basis of knowledge.[9] *Cf. United v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999). His report was not based on hearsay; rather, he provided first hand details on how Plaintiff allegedly stole the grinder and other tools, he provided a specific list of other items he alleged Plaintiff stole, and he explained how he came to have this information and why he was divulging it. The tip was not anonymous; Goff met with Welsher in person, allowing the deputy to assess his credibility. There is, however, no other indicia of Welsher's reliability or

---

[9] For the purposes of this discussion, the Court imputes the findings of Palacios's and Goff's investigations to Davis. *See United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir.1990) ("when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.")

veracity. There is no evidence Goff, Palacios, or Davis knew Welsher previously, Welsher had no history with the HCSO as an informant, and no deputy sought to independently corroborate the details of Welsher's statement -- except through a search initiated after Plaintiff's arrest. Moreover, Plaintiff correctly notes that much of Huggins' statement constitutes hearsay, and the rest is of limited value. At most, Huggins could attest, based on personal knowledge, that he saw TIC radios in Welsher's residence, which formerly belonged to Plaintiff. Finally, when Goff and Arnold confronted Plaintiff, Plaintiff avers he reported facts tending to discredit Welsher: that Welsher was a drug addict, that Welsher had twice before tried to get other supervisors in trouble; and that Welsher was the one who started the fight approximately ten days before.

Goff noted that Welsher made an incriminating statement, by admitting that he helped Plaintiff move and hide the stolen tools, and that he did not hide his past drug activity. However, self-incrimination, "without more will not raise an informant's tip to the level of probable cause required under the Fourth Amendment." *Ortega*, 85 F.3d at 1525. The only fact differentiating this case from *Ortega v. Christian*, in which the Eleventh Circuit found the officers lacked probable cause based on an uncorroborated tip by an unknown informant, is that Welsher gave a more detailed and first-hand account of Plaintiff's alleged pattern of thefts. This certainly strengthens Welsher's basis of knowledge, but the Court is left with no other evidence of corroboration of Welsher's tip. Defendant has cited to no case, nor has the Court been able to locate one, in which an informant's tip, unverified by independent corroboration or other knowledge, has provided probable cause for a warrantless arrest.[10] The Court is mindful that it is Defendant's burden to show the applicability

---

[10] *See also United States v. Anderson*, 500 F.2d 1311, 1315 n. 8 (5th Cir.1974) (stating that "the standards applicable to the factual basis supporting probable cause for a warrantless arrest and search . . . may even be more stringent" than those applied to a search warrant). However, even in cases involving probable cause to obtain a

of the defense of probable cause in its motion for summary judgment, which Defendant has failed to do.

Defendant Gee's motion for summary judgment on Count II is therefore denied. Because the motion is denied as to Plaintiff's underlying state law claims, the motion is also denied as to Plaintiff Rhonda Higgins' claim for loss of consortium (Count V).

### *Conclusion*

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant David Gee's Amended Dispositive Motion for Summary Judgment (Dkt. 34) is **GRANTED IN PART** as to Count IV and **DENIED IN PART** as to Counts II and V.

**DONE AND ORDERED** in chambers this 18th day of January, 2008.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record

---

search warrant, the courts appear to require some independent knowledge or corroboration. *See Owens v. State*, 854 So. 2d 737, 739 (Fla. 2d DCA 2003); *Brundidge*, 170 F.3d at 1353 (finding probable cause for a search warrant where "CI's basis of knowledge made up for any weaknesses in the CI's veracity," but finding veracity based on eight previous tips); *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (stating that where probable cause was based on informant's highly credible story, corroborated by officer's knowledge and observation, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants").